UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| RLB & ASSOCIATES, LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:15-cv-123 |
| ) | |
| ASPEN MEDICAL PTY. and ASPEN ) | |
| MEDICAL USA, INC. ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COMPLAINT FOR LACK OF PERSONAL JURISDICTION**
(Doc. 10)

Plaintiff RLB & Associates, Ltd. brings this action against Defendant Aspen Medical Pty. and Defendant Aspen Medical USA, Inc. (collectively, "Defendants") for breach of contract, fraud, and tortious interference with business relationships. Pending before the court is Defendants' Motion to Dismiss Complaint for Lack of Personal Jurisdiction (Doc. 10). Plaintiff opposes the motion. After supplemental briefing by both parties, the court took the motion under advisement on December 21, 2015.

Plaintiff is represented by H. Kenneth Merritt, Jr., Esq. Defendants are represented by R. Jeffrey Behm, Esq. and Paul N. Murphy, Esq.

**I.   Factual and Procedural Background.**

The facts are derived from Plaintiff's complaint, as well as the affidavits and documents submitted by the parties in relation to the pending motion. Plaintiff is a Vermont corporation with its principal place of business in Montpelier, Vermont. It provides "finder services" for companies seeking clients abroad. (Doc. 28-1 at 2, ¶ 4.) Defendant Aspen Medical Pty. is an Australian corporation that "provide[s] emergency medical services and healthcare solutions worldwide." (Doc. 10-1 at 1, ¶ 3.) Its wholly-

owned subsidiary, Defendant Aspen Medical USA, Inc., is a Delaware corporation with its principal place of business in Texas. Defendants have "no office, officer, employee, [] agent[,] . . . property[,] . . . assets, investment, or security interests" in Vermont. *Id.* at 3, ¶¶ 19-20. None of their eight potential witnesses reside in Vermont.

Plaintiff was introduced to Defendants through a Montreal-based consultant. After communication with Defendants in mid-2011, Plaintiff sent an email to Defendants to discuss their interest in securing clients outside of Australia. Plaintiff's Vermont mailing address was displayed in this email. Plaintiff's email correspondence also contained a link to its website, which identified its place of business as Montpelier, Vermont. After this initial correspondence, Plaintiff "had a phone call" with Mr. Glenn Keys, a Director employed by both Defendants. (Doc. 28-1 at 2, ¶ 9.) During this conversation, Mr. Keys identified Latin America as a region of potential business development in which Plaintiff might be of assistance.

In October 2011, Plaintiff sent a "Draft of Proposal for Latin America" (the "Draft Proposal") to Defendants, in which Plaintiff's Vermont address is set forth on the first page.[1] (Doc. 28-2 at 2.) Plaintiff contends that the Draft Proposal "largely reflected the substance" of its prior phone call with Mr. Keys. (Doc. 28-1 at 2, ¶ 10.) The Draft Proposal states that "[c]ommerical activities in Latin America develop from personal relationships. Underlying most activity is a person-to-person connection between the principal parties. [Plaintiff] and [its] associates in Latin America can assist in developing such essential relationships." (Doc. 28-2 at 2) (emphasis omitted). The Draft Proposal further explains that because Latin American clients seek more of a "partner than only a provider of goods and services[,] [t]he use of local personnel and services is essential." *Id.* at 2-3 (emphasis and internal quotation marks omitted). According to Plaintiff, the Draft Proposal "indicated that potential clients would be approached and vetted through the use of phone and e-mail communication prior to in-person meetings." (Doc. 28-1 at

---

[1] The parties have submitted different versions of the Draft Proposal, which vary only in their italicization, bolding of certain words, and the existence of a typographical error.

2

3, ¶ 14.) Thereafter, Plaintiff would engage in a "preparatory meeting" with the potential client prior to the client's formal introduction to Defendants. (Doc. 28-2 at 3.)

"[B]ased upon [its] experience in Latin America," Plaintiff "design[ed]" the Draft Proposal in an effort to reach a final agreement with Defendants. *Id.* at 2 (emphasis omitted). Plaintiff proposed that a "General Agreement" should include "a mandate for a specific time, [twelve] months minimum," which upon "defined success" would be extended. *Id.* at 4. Plaintiff noted that it expected "to focus on several carefully selected regions and countries to start." *Id.* at 5. It also proposed triggers and a schedule for the payment of its fees and expenses.

In late-2011, Plaintiff sent Defendants a draft "Non-Circumvention, Non-Disclosure and Fee Agreement for Latin America[,]" (Doc. 28-3), which "memorialized" the Draft Proposal. (Doc. 13-1 at 1, ¶ 7.) Defendants revised the contract term from one-year to six-months, and sent it back to Plaintiff. On or about January 11, 2012, the parties executed their final Non-Circumvention, Non-Disclosure and Fee Agreement for Latin America (the "Agreement"). Plaintiff's location is identified on the first page of the Agreement, and Plaintiff signed the Agreement in Vermont. Defendant Aspen Medical Pty. signed the Agreement in Australia, and Defendant Aspen Medical USA, Inc. signed it in Texas. The Agreement contains no choice of law provision or forum selection clause.

Pursuant to the Agreement, Plaintiff agreed to introduce "potential clients, or consultants and professionals in the health sector" in the "Territory"[2] to Defendants "with the goal of [Defendants] establishing a long-term service provider relationship with such Introduced Parties[.]" (Doc. 28-3 at 2, ¶¶ 1-2.) The "Introduced Parties" are identified in Attachment A to the Agreement and consist of nine individuals or entities located in Brazil, Argentina, Chile, Peru, Mexico, and Venezuela. Pursuant to the Agreement, "[t]he role of [Plaintiff] [was] restricted to that of 'Finder,' and [Plaintiff] [was] not [to] provide business advice, act as an agent of [Defendants] in any manner, or provide any other services to [Defendants][.]" *Id.* at 3, ¶ 3.

---

[2] The Agreement does not define the "Territory."

The Agreement states that Plaintiff will receive a $2,000 retainer fee each month. In the event Plaintiff facilitated a business relationship between Defendants and an "Introduced Party[,]" the Agreement required payment to Plaintiff of a "Success Fee[,]" which would be determined by a percentage of annual fees and revenue received by Defendants from the "Introduced Party." *Id.* at 3, ¶ 6. Defendants agreed to compensate Plaintiff for all "pre-approved expenses[,]" and "[i]f and when [Plaintiff] [was] requested by potential clients to attend preparatory meetings, [Plaintiff] [would] review the opportunity with [Defendants], and if such a meeting [received] approv[al], [Plaintiff] would] be remunerated at a rate of $500 per day for time on-site and expenses[.]" *Id.* at 4, ¶¶ 9, 11. The Agreement provides for a six-month term, which "[t]hereafter, [] shall be renewed for additional [three] month periods unless terminated by either [p]arty with [thirty] days written notice." *Id.* at 5, ¶ 14.

From January 2012 until Defendants terminated the Agreement in October 2014, Defendants paid Plaintiff the monthly retainer fee required by the Agreement via wire transfer to Plaintiff's Vermont bank account. Mr. Ronald L. Boucher, Plaintiff's President and its sole member of the Board of Directors, avers that "[t]he vast majority of the work [Plaintiff] performed under the [Agreement] took place out of [Plaintiff's] principal business address in Montpelier, Vermont." (Doc. 28-1 at 3, ¶ 24.) As part of its work, Plaintiff corresponded with Defendants "in the form of hundreds of e-mails, landline calls, and Skype calls." *Id.* at 3, ¶ 20. Plaintiff's email signature includes its Vermont contact information.

Mr. Keys, a Director for Defendants, avers that Defendants "never intended or agreed that [Plaintiff] would perform the [A]greement outside Latin America." (Doc. 10-1 at 3, ¶ 17.) He further avers that Defendants "understood and believed that [Plaintiff's] services under the [A]greement related solely to Latin America, and that [it] performed the contract there." *Id.* at 3, ¶ 18.

While the Agreement was in effect, Defendants met with Plaintiff on several occasions. These meetings took place in Latin America and in the state of Virginia. In late-March and early-April, Defendants met a prospective customer, whom Plaintiff had

4

introduced to Defendants, in Latin America. That meeting did not result in a successful business relationship.

In its Complaint, Plaintiff alleges that it "introduced numerous suitable businesses to Defendants," but that Defendants never developed successful business relationships with any of them. (Doc. 1 at 3, ¶ 19.) Plaintiff claims that Defendants acted fraudulently and in breach of contract because when they signed the Agreement, "Defendants were aware . . . that no business in Latin America would be considered or approved by [one of Defendants'] principal[s]." *Id.* at 3, ¶ 22. Plaintiff thus never had the opportunity to earn any "Success Fees." Plaintiff further alleges that "Defendants' continued refusals to provide necessary information and meet with representatives of such potential clients interfered with and damaged Plaintiff's business and business reputation." *Id.* at 4, ¶ 31.

Plaintiff's Complaint alleges claims of breach of contract, fraud, and tortious interference with business relationships. In their Answer, Defendants assert the lack of personal jurisdiction as an affirmative defense. After filing their Answer, Defendants moved to dismiss the case for lack of personal jurisdiction. In support of their motion, Defendants submitted Mr. Keys's declaration. Plaintiff's opposition relied upon Mr. Boucher's declaration. After oral argument, the parties were permitted to file supplemental materials. Defendants filed a declaration from Yolanda Kuruc, Defendants' General Counsel; and copies of the Draft Proposal and the Agreement. Plaintiff filed another declaration from Mr. Boucher, as well as copies of the Draft Proposal and the Agreement.

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). In determining whether plaintiff has met its burden, the court may "consider[] materials outside the pleadings[] . . . without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment." *Dorchester Fin. Sec., Inc. v. Banco*

*BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). The plaintiff must make a *prima facie* showing that personal jurisdiction exists, and "[i]n evaluating whether the requisite showing has been made, [the court] construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiff[]." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

### B.    Whether the Court has Personal Jurisdiction Over Defendants.

"In diversity or federal question cases the court must look first to the long-arm statute of the forum state[.]" *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). "[T]he second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). Vermont's long-arm statute, 12 V.S.A. § 913(b), provides:

> Upon the service [on a party outside of Vermont], and if it appears that the contact with the state by the party or the activity in the state by the party or the contact or activity imputable to him is sufficient to support a personal judgment against him, the same proceedings may be had for a personal judgment against him as if the process or pleading had been served on him in the state.

The Vermont Supreme Court has construed Vermont's long-arm statue as permitting the exercise of personal jurisdiction to the "full extent permitted by the Due Process Clause" of the United States Constitution. *N. Aircraft, Inc. v. Reed*, 572 A.2d 1382, 1385 (Vt. 1990). Accordingly, the court need only examine "whether the exercise of [personal] jurisdiction comports with federal due process. To do so, [it] undertake[s] an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002); *see also N. Aircraft*, 572 A.2d at 1386 (providing that "once the court determines that a nonresident defendant has purposefully established minimum contacts within the forum State, several factors must be considered to ensure that exercising personal jurisdiction over the defendant is reasonable") (citation and internal quotation marks omitted).

"To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). Specific jurisdiction "exists when a [forum] exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum[.]" *Id.* at 673-74 (internal quotation marks omitted). In contrast, general jurisdiction "is based on the defendant's general business contacts with the forum . . . and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* at 674 (internal quotation marks omitted). In this case, there is no factual basis for general jurisdiction, and Plaintiff argues only that specific jurisdiction exists.

When evaluating specific jurisdiction, the court must determine whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[,] . . . [which] ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts[.]" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted). "For the purpose of establishing specific personal jurisdiction, the necessary fair warning requirement [*i.e.*, that the defendant could reasonably anticipate being sued in the forum state] is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *In re Terrorist Attacks*, 714 F.3d at 674 (internal quotation marks omitted). "A court deciding whether it has jurisdiction over an out-of-state defendant under the Due Process Clause must evaluate the 'quality and nature[]' . . . of the defendant's contacts with the forum state under a totality of the circumstances test[.]" *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King*, 471 U.S. at 475).

Where specific jurisdiction is alleged to be grounded in a contractual relationship, the court must consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[.]" *Burger King*, 471 U.S. at 479; *see also Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir. 2001) ("In

7

determining jurisdiction over a breach of contract claim, [the court] must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing."). "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, . . . the answer clearly is that it cannot." *Burger King*, 471 U.S. at 478.

Plaintiff urges reliance on an unpublished decision from this court, *Mansfield Heliflight, Inc. v. Heli-One Can. Inc.*, 2012 WL 4479851 (D. Vt. Sept. 28, 2012), in which the parties engaged in "a significant amount of negotiation," the contract contemplated a transaction involving goods worth $1,300,000, and the plaintiff's primary activity under the contract was to coordinate the sale of helicopter parts located elsewhere from its principal place of business in Vermont. *Id.* at *1. Although that case addressed whether the court had specific jurisdiction over the defendants, the primary thrust of its analysis concerned whether there was sufficient integration between the two defendant corporations to warrant imputing their contacts with the forum state to each other. *See id.* at *6-8. The remaining "minimum contacts" analysis does not provide a basis for finding specific jurisdiction in this case. *See id.* at *8.

Plaintiff argues that Defendants had "minimum contacts" with Vermont because they were aware of Plaintiff's Vermont location, voluntarily agreed to contract with Plaintiff, and made payments to Plaintiff in Vermont. In addition, Plaintiff argues that Defendants should have contemplated that much of Plaintiff's contractual work would take place in Vermont.

Defendants' awareness of Plaintiff's business operations in Vermont, while a factor to be considered, is not dispositive because it would impermissibly establish "minimum contacts" based solely upon the plaintiff's location. *See Burger King*, 471 U.S. at 478 ("The Court long ago rejected the notion that personal jurisdiction might turn on mechanical tests, or on conceptualistic . . . theories of the place of contracting or of performance[.]") (citation and internal quotation marks omitted); *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1191-92 (D.C. Cir. 2013) (noting that the defendant's knowledge

8

of the plaintiff's location in the forum district did not establish the defendant's "minimum contacts" with that forum).

As Defendants point out, they did not "reach out" to Plaintiff, but instead were solicited by Plaintiff to enter into a business relationship. *Cf. Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 32 (2d Cir. 1996) (noting that the defendants had "deliberately reach[ed] out beyond their home states" in concluding that they "purposefully availed themselves of the forum and should have reasonably foreseen being haled into court [t]here") (internal quotation marks omitted). "The case law is clear that where[] . . . a defendant does not actively initiate contacts in a state, a court does not ordinarily exercise jurisdiction over that defendant, unless there is some other evidence of minimum contacts with the forum state." *Artec Distrib., Inc. v. Video Playback, Inc.*, 799 F. Supp. 1558, 1560 (D. Vt. 1992).

Thereafter, Plaintiff and Defendants engaged in only minimal negotiations prior to entering into the Agreement. *Cf. Burger King*, 471 U.S. at 466-67 (describing the four-month negotiation period during which "the parties . . . disagree[d] [and negotiated] over site-development fees, building design, computation of monthly rent, and whether the franchisees would be able to assign their liabilities to a corporation they had formed"). These minimal negotiations resulted in a short-term Agreement contemplating business development solely in Latin America. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000) (in reaching the conclusion that the defendant was not subject to personal jurisdiction in Virginia, noting that "[n]ot only did [the plaintiff] initiate the contractual relationship in Ohio, but the resulting agreement contemplated the bulk of the contract's performance . . . in . . . Ohio"); *Cooper, Robertson & Partners, LLP v. Vail*, 143 F. Supp. 2d 367, 371 (S.D.N.Y. 2001) (providing that "the place of performance is more critical than the place of the execution of a contract").

Although Plaintiff may have worked remotely in Vermont to develop business relationships in Latin America, "it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1126

9

(2014); *see also Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."); *Thompson Hine*, 734 F.3d at 1194 ("The mere fact that a nonresident has retained the professional services of a [forum district] firm, thereby setting into motion the resident party's own activities within this jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the [d]istrict's laws.") (internal quotation marks omitted). Similarly, the fact that the majority of Plaintiff's communications emanated from Vermont and Defendants' payments were sent and deposited there, reflects choices made by Plaintiff and is not the result of Defendants' intentional formation of contacts with Vermont or availment of the right to do business there.

      The terms of the Agreement neither imposed any long-term obligations or exacting restrictions on either party, nor required any activity to take place in Vermont. *See Thompson Hine*, 734 F.3d at 1192 (noting that the seven-month contractual relationship between the parties did not reflect "continuing [or] wide-reaching" contacts, and did not "touch[] the [forum] [d]istrict in any way" in reaching the conclusion that the defendant lacked "minimum contacts" with that forum) (internal quotation marks omitted); *cf. Burger King*, 471 U.S. at 480 (observing that the parties "entered into a carefully structured [twenty]-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida[,]" and that the franchisee defendant expected ongoing and frequent interactions with Burger King's Miami headquarters). The Agreement did not regulate where Plaintiff worked, the hours it worked, the manner in which it approached potential clients, or the amount of time it devoted to providing its services. *Compare with Burger King*, 471 U.S. at 465 n.4 (noting that from its offices in Florida, Burger King imposed numerous requirements on the defendant franchisee, including regulating the accounting and insurance practices, hours of operation, building layout, service and cleanliness standards, and the "range, quality, appearance, size, taste, and processing of menu items") (internal quotation marks omitted).

The Agreement did not specify that Vermont law would govern any lawsuit, did not identify Vermont as the location for the resolution of disputes, and did not indicate that Defendants consented to suit in Vermont. *See CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366-67 (2d Cir. 1986) (noting that "a choice of law provision in a contract does not constitute a voluntary submission to personal jurisdiction" but does deserve "some weight" when analyzing personal jurisdiction); *Thompson Hine*, 734 F.3d at 1192 (explaining that "[w]hile such provisions are clearly not dispositive under *Burger King*, their presence can be indicative of the parties' own perceptions of their degree of contact with a particular forum") (internal quotation marks omitted).

Examining the totality of the circumstances, Defendants' contacts with Vermont are insufficient to establish "minimum contacts" because those contacts arise solely from Plaintiff's choice of where to perform preparatory work for an Agreement that focused exclusively on the development of business in Latin America. In this respect, Defendants' contacts with Vermont are the result of choices made exclusively by Plaintiff and are not the result of Defendants targeting their activities towards Vermont and its residents. Their contacts are therefore random, fortuitous, and attenuated, and do not reflect any decision by them to purposefully avail themselves of the privilege of doing business in Vermont. Plaintiff has thus failed to "show[] that the court has jurisdiction over the defendant[s]." *See Metro. Life Ins.*, 84 F.3d at 566. The exercise of personal jurisdiction over Defendants would therefore violate the Due Process Clause. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418-19 (1984) (holding that where the defendant's contacts are "insufficient to satisfy the requirements of the Due Process Clause[,]" the exercise of personal jurisdiction is impermissible).

Even if Plaintiff had established Defendants' "minimum contacts" with Vermont, dismissal would remain appropriate because the exercise of personal jurisdiction over Defendants would not comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). In making this determination, the court evaluates "the burden on the defendant, the forum State's interest

in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (internal quotation marks omitted). "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" *Bank Brussels Lambert*, 305 F.3d at 129.

Defendants characterize their burden of litigating in Vermont as "extreme" in both "logistics and expense[.]" (Doc. 10 at 7.) They have identified eight potential witnesses, all of whom reside outside of Vermont and do not have any relationships with Vermont that would mitigate their burden in litigating there. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999) (holding that "[t]here would, of course, be a substantial burden imposed on [the defendant], a Japanese manufacturer, if it is forced to defend a suit in New York"). Although the Second Circuit has noted that "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago[,]" *Bank Brussels Lambert*, 305 F.3d at 129-30 (internal quotation marks omitted), in this case, Defendants are not located in an adjoining state or, in the case of Defendant Aspen Medical Pty., even in an adjoining country. They will thus inevitably face some burden in defending a lawsuit in Vermont.

Vermont generally has an interest in protecting its residents' business interests. *See Burger King*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."); *see also KBA N. Am. Inc. v. Amerigraph, LLC*, 2007 WL 4119119, at *3 (D. Vt. Nov. 16, 2007) (noting that "Vermont has a clear interest in protecting the business interests of its residents"). However, Vermont's interest in this particular dispute is relatively minor. The Agreement does not contemplate introductions to business parties in Vermont, and does not provide that Vermont law would apply to any dispute arising under the Agreement. Plaintiff's claims in this action do not allege a

12

violation of Vermont public policy but, rather, reflect a purely private contractual dispute. *See Metro. Life Ins.*, 84 F.3d at 574 (noting that the forum state lacked an interest in the dispute because "[t]he acts and omissions that serve as the basis for [the plaintiff's] suit occurred" outside of the forum state); *cf. First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 403 (S.D.N.Y. 2002) (concluding that the exercise of personal jurisdiction would be reasonable and noting that "New York has a strong interest here in enforcing its debtor-creditor law, as the fraudulent conveyances at issue allegedly were made to frustrate New York judgments" and that the plaintiffs had "strong interests in litigating" in New York because "many of the key events surrounding [their] claim allegedly transpired in New York").

There is also no indication that Plaintiff would face any prejudice if the dispute were litigated in another forum. Although Plaintiff has chosen to bring this action in Vermont because it claims "Vermont is a more convenient route to relief than filing suit in another state, or in Australia," (Doc. 13 at 8) (internal quotation marks omitted), that decision is entitled to limited deference. *See Metro. Life Ins.*, 84 F.3d at 574 (noting that "[the Second Circuit] fail[s] to see how the plaintiff's interests in proceeding in a convenient forum would be served by subjecting the defendant to suit in [the forum state]").

In evaluating whether the exercise of personal jurisdiction will result in the efficient administration of justice, the court "generally consider[s] where witnesses and evidence are likely to be located." *Metro. Life Ins.*, 84 F.3d at 574. Plaintiff asserts that "all of [its] supporting witnesses and evidence are located in Vermont[,]" (Doc. 13 at 8), but it has not identified any specific witnesses or evidence located in Vermont. In contrast, Defendants have claimed with some specificity that all of their potential witnesses are located outside of Vermont.

Finally, the court must "consider the common interests of the several states in promoting substantive social policies." *Metro. Life Ins.*, 84 F.3d at 575. Neither Plaintiff nor Defendants suggest that any substantive social policies are implicated in this case; this factor is therefore in equipoise. *See Kernan*, 175 F.3d at 245 ("The parties have not

13

suggested or shown that any substantive social policies would be furthered or undermined by permitting the case against [the defendant] to go forward in [the forum state], . . . [so] [t]his factor thus does not weigh in either party's favor.").

On balance, Defendants have demonstrated that subjecting them to suit in Vermont would be unreasonable because it would unfairly require them to litigate in a state where the key events did not occur, the majority of the witnesses are not located, and where the law of the forum state may not apply. *See Pioneer Credit Corp. v. Carden*, 245 A.2d 891, 894 (Vt. 1968) (adopting the Restatement of Conflicts of Law for resolution of a contractual dispute, and articulating the several factors that the court must consider when determining which law to apply); *McKinnon v. F.H. Morgan & Co., Inc.*, 750 A.2d 1026, 1028 (Vt. 2000) ("This [c]ourt has adopted the Restatement (Second) of Conflicts for choice-of-law questions in both tort and contract cases."). Accordingly, dismissal of this case is warranted for the further reason that "subjecting [the defendant] to suit in Vermont would be contrary to traditional notions of fair play and substantial justice[.]" *See Metro. Life Ins.*, 84 F.3d at 575 (holding that the district court therefore "properly dismissed the suit for want of personal jurisdiction") (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the court hereby GRANTS Defendants' Motion to Dismiss Complaint for Lack of Personal Jurisdiction (Doc. 10).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27th day of January, 2016.

Christina Reiss, Chief Judge
United States District Court